We represent investors who purchase stock in Zafgen, which is a 12-person small biotech pharma company that went public on the strength of one particular drug called beluronib. Beluronib was a drug, the class of drug that it was had a history of side effects involving cardiovascular events. As we pled in our complaint, there were quite a number of scientific articles out in the market which suggested that there was a potential link between this particular class of drug and cardiovascular events. Were those articles referring to the drugs administered in the quantities used in cancer treatment? Those articles were talking about drugs in cancer treatment, yes, your honor. There were two articles in particular that did talk about Zafgen and beluronib itself. But it had no data on that yet. I'm sorry, but it's correct, your honor. At the time the company went public, as we allege, they reported on the results of what they called their ZAF-201 trial, which was a 166-person, I believe it was a phase two clinical trial. 122 patients were taking the drug, 40 were on the placebo. The company reported that they found two serious adverse events, thrombotic adverse events, that their clinical investigators had determined were not caused by the drug. Nonetheless, that was disclosed, and the company said, based on the utility of that finding, we are now going to change our protocol for future trials. We are going to screen for thrombotic events, and in particular, they said, we are going to add vigilance and look for blood clotting, adverse events relating to blood clotting in future trials. Now, as we allege, in the ZAF-201 trial that had already been completed, there were two very such adverse events relating to blood clotting. Weren't those minor events? Yes, they were, your honor. Could a minor event be something as simple as a bruise or a surface bruise which results in some bleeding? Yes, your honor, they were, but we think the significance in which... Why is it significant, then? Well, we think that what changes the calculus here is that this particular class of drug, as we said, there is some connection between it and potential thrombotic events, and in fact, we think the inference in our favor is that because this company changed its clinical trial and said that we are now going to start screening for adverse events relating to blood clotting, and they didn't say serious, they just said adverse events, that certainly now changes the game and raises the level that they understood that there was this potential connection. And what it did was it changed the risk profile of this company. So when I'm an investor... That's going forward. Yes, your honor. So as I'm an investor and I'm deciding whether I want to invest in this company, and as we said, they raised $240 million from the public in their initial and secondary offering based on the results of this trial. Instead of reporting four adverse events from this drug, which gives you a 3% rate... Whether they were caused by the drug or not would be an open question, would it not? Yes, exactly, your honor. And we're not saying at the time that there was any scientific evidence or statistically significant evidence that these events were caused by the drug, but I think the Supreme Court's decision in Matrix makes clear that you don't need to have statistically significant evidence before there is an obligation to disclose an adverse event. The question, as the court said in Matrix, was what is the context? And here we think the context is when you inform your investors. We are changing our protocol, and we're now going to screen and look for these very types of adverse events to withhold from your investors that two such events have already occurred is what takes this case from they're just minor to a case of a strong inference of scienter. Because after all, why would you tell your investors we are going to change our protocol and we are now going to... Because you had two serious events. Right, but they changed the protocol because of the two serious events to screen for the very two minor events... Well, you had two serious events and you said, okay, we probably ought to screen more widely. Isn't that a practical thing to do? Well, yes, Ron, I do think it's a practical thing to do, but I also think what's practical is if you've already observed what you say you're going to screen for, you should disclose it. Because an investor in a biotech startup company assessing the risk of this company and assessing whether they want to make an investment wants to look at the very same information that ultimately is going to go to the FDA that they're going to look at to decide whether we're going to get approval. After all, that's the ballgame. My understanding is that there were third-party investigators who actually categorized these two unreported events as superficial.  Well, it makes a difference, Your Honor, because it changes the rate and frequency by which adverse events are being reported. And those are the very things that the FDA looks at in determining whether to grant NDA approval. And in fact, what we saw here, when the FDA placed the trials on a clinical hold, it cited... That was after a death. Yes, but as the company said, the clinical hold was based on the death and the frequency of the number of adverse events, and they said a varying severity. And in their conference call with the analysts, they pointed to six adverse events, the two serious from the ZAF-201 trial that were disclosed, the two non-serious from the ZAF-201 trial that were not disclosed, and two subsequent adverse events in future trials. Much of your argument so far has been towards the notion that the two non-serious events in their occurrence was material, so that it should have been disclosed. Let's, for the purpose of this question, assume that's the case. I think what you need to do to get to Center is you need to argue that the materiality was so great and so obvious that one can infer, and perhaps with, you know, if you had a confidential informant, that would help. If you had material insider trading, that would help. But you want us to infer from the degree of materiality that they must have known that it should be disclosed and therefore intentionally or recklessly decided not to. And then you're missing what you have in some other cases where that disclosure thing at the end results in the stock dropping. But here we've got a death that occurs at the end with the FDA announcement. So you're asking the materiality to do a lot of work here, and I think Judge Stahl's questions are suggesting it's not obviously a big materiality, even if it is material. I understand, Your Honor. Let me first go to the scienter, and then I'll go to the end in connecting the drop. We think that the scienter here is inferred from looking at the objective facts, which is what this Court said and did in the City of Dearborn v. Waterscape. We think that the lower court noted on three separate occasions that there was a lack of direct evidence. As the Supreme Court said in Talab's, and this Court has repeatedly said, that's not necessary. The plaintiffs get the inferences. So simply we think the inferences here are, one, the company changed its protocol to start screening for adverse events, even though they didn't say they were serious. They were adverse events relating to blood clotting, but withheld from investors that two such events had already occurred. Well, our theory of the case is in our inference is, why would you change your protocol when you have two serious adverse events that your clinical investigators have said are not connected to your drug, unless there's a concern? The trickiness seems to me, the S1, as I understand it, expressly said we won't disclose even serious adverse events if not characterized by the clinical investigators as possibly related. So they told all the investigators, we're not even telling you about all the serious adverse events. They went forward and told them, though, nevertheless, despite having that cover, about two serious thrombosis events that occurred. The proposition is then that they sat there and said, yeah, but we're not going to tell them about these two unserious events, because, boy, if they knew about that, then the stock would drop. It's hard seeing that from anything in the case that would suggest that any investor would have thought two seconds differently than they did had he been told, oh, yeah, there were these non-serious events, even though they were being told they weren't even being disclosed all the serious events. Well, yes, Your Honor, they did say we were not going to disclose the serious, but then they went ahead and disclosed them. Right. And so, as we say in the lower court found, once you start going down the path of disclosure, you have a duty to disclose and make your disclosures full, complete, and accurate. Right, but the proposition on the CN2 issue is that these people who had cover for not disclosing the serious ones went ahead and disclosed those, but then said, aha, we're not going to disclose these two other ones that are both non-serious, and the clinical investigators aren't attributing to our drug at all. I see the logic of your argument that because they said they were going to investigate for them, even that was material. But is it material enough that by itself it does the scienter-inferring work that you need it to do? Well, we think the scienter comes from the change in the protocol and by informing their investigators. Is there anything else you've got other than a say? We have the scientific articles. There are two specific articles that talk about this company and ballerinib. They all go to materiality, right? Well, but we think they also talk about the potential connection between this drug and thrombosis and cardiac arrest. That is materiality. Well, we think that though that raises the... In other words, you're pointing to articles, as I understand it, correct me if I'm wrong, that if Red would suggest that there could be some relationship, depending on dose, between even the non-serious events in this drug. So it's therefore material to know about the non-serious events. I get that. And I get that you can get materiality up to a level where, boy, not to disclose something so material as that, we're going to infer a scienter. So I understand that argument. I just simply want to know, is there anything else other than that material, using materiality to generate scienter that you'll point us to? Well, what I would point to, and Ron, and I'll talk about the drop at the end and what the analyst said, and the analyst all pointed to a 3% adverse event rate that they then saw that the company had disclosed versus from the ZAF-201 trial, you saw 1.5% adverse event rate. So what it does is it doubles the adverse event rate. And that's what we think an investor would want to know, that you're seeing a 3% adverse event rate in your IPO, and it changes the risk-benefit calculus for the investor. And if I may just very briefly, what happened at the end was there was a rumor of a report of a patient that died, stock price fell, then ZAF-201 issued a press release saying that the patient died, but there was no indication as far as whether or not the patient was taking the drug, and the price of the stock went up. And it wasn't until the subsequent disclosure that not only was the patient taking the drug, but there was the clinical hold and the disclosure of all these adverse events, all six, that you then saw another drop in the price. I'm surprised that the announcement that the guy who died was taking the drug, that seems like a black hole that would suck everything into it. Well, right, but some of the analysts actually commented and said, we're not necessarily troubled by the patient death because you already have a sick patient population. We are troubled by the number of adverse events we are seeing in the people who are taking the drug, whereas zero in the placebo group. And that's obviously what makes it, we think, more material and raises the bar on the Sienter analysis because clearly what investors are looking at is the rate by which adverse events are occurring. Thank you. Thank you, Your Honors. Good morning, Your Honor. Deborah Birnbach for ZAFCHEN and Dr. Tom Hughes. May it please the Court. I think the Court's discussion of Sienter is key to what I would like to emphasize in this time. The standard in this circuit is conscious intent, intentional fraud or recklessness, and recklessness is defined as an extreme departure from the standards of ordinary care such that the defendant was aware there was a danger of misleading investors. And what's utterly missing from this amended complaint is any hint that Dr. Hughes had any discussions, thoughts, warnings by subordinates, e-mails, documents, or even any circumstantial evidence as to Dr. Hughes' state of mind that these two superficial, meaning the surface of the skin, not related to the drug, lesser adverse events had any bearing on the significance of the issue. What do you say about the argument that the occurrence of a clot is actually the key thing to know? The clot could fortuitously occur anywhere. So the fact that the two other events are non-serious is fortuitous. They could have been serious had they occurred elsewhere in the body. And so therefore, as I understand the rationale behind that argument, it would be that they're actually just as material as the serious ones. Only there are no facts in the amended complaint, particularized facts that say that. In other words, if you look at page 136 in the record where the independent clinical investigators designated each of the adverse events as not related to the drug, they also gave factors and their diagnosis, which is superficial to the surface of the skin. There was no suggestion as compared with a pulmonary embolism, deep vein thrombosis, on the two serious adverse events that the superficial could be caused by a blow to the arm or leg, had anything more to it. And in fact, there were signs in the right-hand column on that chart about certain of the patient's predisposition toward clotting events. So are you saying that if we look at the complaint, because that's our operative document here, we would not find in it a sufficiently supported allegation that there is no material difference between the serious adverse and the superficial adverse? What you'll find in the complaint is references to where the chief medical officer on the October 16, 2015 conference call, which is referenced in the complaint, said that they are dramatically different and the superficial one is either not treated at all or treated symptomatically, so an aspirin or heat if it's even necessary, that's what's referenced in the complaint. But I think the important point is that goes to materiality, if anything, and while we don't concede materiality and the district court found that materiality of these two lesser, also not related to drug events, was questionable, what's utterly lacking here is scienter. So like in the recent Vertex case from this court where what was missing was any acknowledgement by any of the individual defendants of the company that they were alarmed by the overly successful results that then had to get updated. If something is of huge, obvious materiality, couldn't that itself generate an inference of scienter? It could be supportive of, but material information alone is not sufficient for scienter in this circuit, but certainly this court has repeatedly held in Ariadne and elsewhere that scienter and materiality are linked, such that if materiality is low, scienter needs to be in a way correspondingly higher, because immaterial information undercuts a defendant's intent to disclose it, what would be the benefit? Here, just ask yourself the question that when they said we are not disclosing all adverse events, we are not disclosing all serious adverse events, and then warned we may never prove safety, and it may be some of these undisclosed adverse events that cause us in later trials, this was a very early phase 2A stage at the IPO, that cause us not to be approved. When you say all that, and then say, not that you changed the protocol by the way, I encourage the court to look at the disclosure in the record, it said there were no deaths or serious adverse events, possibly, probably, or definitely related to belurinib, so they were all designated as not related, although there were two serious thrombotic adverse events, which while not attributed to belurinib treatment, may point to the utility of assessment of prior history of thrombotic events in patients enrolled in subsequent trials and added vigilance for adverse events in subsequent trials. So what they said there is transparency. Like the Ninth Circuit found in the Bragg-Yellow case that we cite, which is very similar, that it is not a fraud, and it undercuts any inference of scienter, that in the first supposedly fraudulent disclosure, they disclose the most severe adverse events, and that this is an issue. So for the court to infer from zero facts that anyone discussed with Dr. Hughes, or that he so much ever had anything influencing him as to the two undisclosed lesser events, scienter just isn't a close call on this one under our standard for recklessness in the circuit. Importantly, the Genzyme case, which we cited in our brief, but didn't emphasize tremendously, is very instructive here. In the Genzyme case, there was an FDA 483 deficiency letter. FDA inspected a manufacturing facility and found some deficiencies. The company didn't disclose it. There were three bioreactor failures in their manufacturing. The company didn't disclose it. What happened later was the FDA ultimately issued a warning letter, and the company disclosed it based on the same issues that were identified in the deficiency, and this court said in Genzyme that the significance of that information only became apparent much later after these subsequent events, and you can't look back, and you have to look rather at the time the statements were made and say what is alleged in this amended complaint that Dr. Hughes knew at all related to these undisclosed events that made him intentionally list the serious ones and omit the... Why, therefore, did he decide to start monitoring for non-serious ones? Well, it didn't say that we started monitoring for non-serious ones. It said going forward this may, the words are very specific, it may point to the utility of assessment of patient history of thrombotic events and a vigilance, an added vigilance for adverse events. So whether that's serious or not serious, the point was going forward the company transparently told investors it was going to be looking at this, and there were phase three trials to come, additional phase two trials to come, and as we all know, the totality of the safety and efficacy, the company was not making a claim that the drug was safe at this early stage. So we submit that Sienter is not at all present and that this isn't a close case. As to the Biogen case, which we cite, plaintiffs claim that Matrix somehow abrogated that decision. And Matrix stood for the unremarkable proposition, as the Supreme Court noted, that there are no bright lines for materiality. So on the materiality point, all it said was statistical significance isn't a bright line. We don't rely on the lack of statistical significance here in our materiality argument. We will submit this information is not material because no reasonable investor could have been misled by the disclosure of a pulmonary embolism, deep vein thrombosis, and that we will look out for this, and not disclosing lesser events. Importantly, the Rye-Yellow Court in the Ninth Circuit in this very similar circumstance said that you run the risk of basically discouraging companies from disclosing serious adverse events if you hold that there's a duty to disclose every non-serious adverse event. And indeed, the clinical stage of Zafshan is critical here because the companies in this circuit who transparently and voluntarily say, hey, these were two serious adverse events, this is something we'll look at going forward, would be discouraged from doing that. Well, why would that follow? I mean, suppose we were to rule for the plaintiff here, then in terms of how that would incentivize companies like your client, wouldn't it incentivize them to just disclose everything, all the clinical results that came back? What would be the problem with incentivizing that behavior or information for investors? Sure. First of all, an S-1 registration statement would probably be 900 pages with all of the clinical data, and that's not helpful information for investors. What issuers try to do who are clinical stage because they haven't established safety and efficacy, they haven't filed their new drug application even with FDA yet, what they try to say is here's the information we think is important. Whether they're right or wrong in hindsight 18 months later is beside the point because here the PSLA requires plaintiffs to plead specific facts that Dr. Hughes was dangerously misleading, that he had information formed in intent not to disclose it, and there's nothing in the amended complaint about the lesser adverse events that comes close to saying that. If there are not other questions. Thank you. Thank you. Thank you. Your Honors, if I may, I think one of the things that my sister just talked about discussing, the disclosure that's at issue here is she said that the company said they're going to look at this, referring to adding vigilance for blood clotting. When you inform your investors that this is something we're going to look at, we're going to keep an eye on, it's we think the strong inference and the fair inference that you know you're doing that because there's a reason for it. And you do that and you tell your investors you do that because there's a reason for it. And Judge Kayada, as you brought out and we put in our papers, where blood clot occurs sort of is fortuitous, whether it's in your foot, it's in your thigh, or it's in your chest. Well, the nature of it is different, is it not? The nature may be different, but what an investor here wants to assess is what are the possibilities or what are the probabilities that this drug may cause these blood clots. And that goes to whether or not they can get FDA approval because, after all, that's why an investor would invest in a company like this. Could you help us? As I said, the complaints in some of these securities cases and the Keaton cases are very unhelpful to the court because they're so long that they become hard to know what to look at in them. Is there anything cited in the complaint that cites to any literature or scientific backup? What exactly, what paragraph specifically would support the proposition that it's just fortuitous that you get a bruise clot on your arm? Yes, Your Honor. It's in the appellate record 22, and that would be paragraph 49 of our complaint, footnote 9. And what we do is we cite to the Center for Disease Controls in their discussion and definition of blood clots and how where a blood clot occurs or the type of blood clot can be fortuitous. And here we think, again, what's key is investors want to assess what are the risks to this company. And we did cite quite a number of scientific articles talking about this class of drug, two in particular talking about Zafgen and Belorinib, talking about the risk and the safety profile and its interaction with a patient population already at high risk for cardiovascular disease. And I will note that one of the things that the lower court said was that we did not have any allegation that any employee or any defendant actually read the articles. I think that's a fair inference in our favor that they were read. This is a small one-drug company, and since the CEO was actually interviewed for one of the articles, I think it's fair to infer that he probably read it. I know that if I'm interviewed about how this argument went, I will probably read the article to see what they say. So I do think that's a fair inference, and I think those articles infer that there is this potential connection. And I think the company itself recognizes the connection by changing its protocol, what they're going to screen for, but then they don't tell investors all the information. Thank you.